UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 MAR 11  PM 2: 33

BY_____
DEPUTY CLERK

AKINWUNMI OWOPETU,       )
                         )
        Plaintiff,       )
                         )
    v.                   )        Case No. 5:10-cv-18
                         )
NATIONWIDE CATV AUDITING )
SERVICES, INC.,          )
                         )
        Defendant.       )

**OPINION AND ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 10)

Plaintiff Akinwunmi Owopetu, proceeding *pro se*, brings this suit against his former employer Defendant Nationwide CATV Auditing Services, Inc., alleging that he was wrongfully denied overtime compensation owed to him under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a). The matter came before the court on September 9, 2010 for oral argument on Nationwide's motion for summary judgment. Mr. Owopetu supplemented his opposition to Nationwide's motion on October 18, 2010, and on October 29, 2010, Nationwide moved to strike Mr. Owopetu's supplemental pleading and filed a reply in further support of its motion for summary judgment. The court denied Nationwide's motion to strike in a text order on March 4, 2011. For the reasons set forth below, Nationwide's motion for summary judgment (Doc. 10) is DENIED.

I.    **Undisputed Facts.**

Mr. Owopetu was employed by Nationwide as a cable service technician working out of Nationwide's Raleigh, North Carolina facility from June 5, 2009 to November 13, 2009. Nationwide is a subcontractor for the cable company Time Warner Cable ("TWC"), installing and servicing cable television and broadband internet products for

TWC customers.  Nationwide receives its work orders from TWC to provide specified services for TWC customers.  The work is completed by Nationwide technicians such as Mr. Owopetu at the homes of TWC subscribers.  Once a work order is scheduled, customers may contact Nationwide directly if they have any questions or concerns regarding the order.  Nationwide is compensated by TWC according to a rate schedule for each individual service that is part of Nationwide's contract with TWC (the "Contract").  Nationwide does not charge TWC customers directly, and has no role in setting the prices that customers pay to TWC, if any, for the services that Nationwide provides.

Nationwide pays its Raleigh technicians, including Mr. Owopetu, a forty-five percent "cut" of the scheduled rate for the specific jobs performed by the technician.  In other words, the technicians receive forty-five percent of the amount that TWC pays to Nationwide for each service that Nationwide provides to TWC customers.  Thus, if the Contract's rate schedule requires TWC to pay Nationwide $34.00 for installing a cable card at the home of a TWC customer, then the technician performing that work would receive $15.30 of that payment.  Technicians are also paid a set hourly wage while in training, and receive additional compensation for training other employees, but money received as a cut of Nationwide's sales always amounts to more than fifty percent of the technicians' total compensation in any period of one month or more.  During the relevant time period, technicians were not paid overtime wages for hours worked in excess of forty hours per week.

On a daily basis, Nationwide distributes work orders received from TWC to technicians based on their past "quality control rating" and customer complaints.  Therefore, high performing technicians are better positioned to receive the most lucrative work orders.  Technicians with free time who desire more work are permitted—but neither required nor expected—to call back to Nationwide to see if they can be assigned any additional work orders.  In addition, technicians can increase their earnings by persuading customers to purchase services in addition to those specified on a particular

work order.  If the customer elects to purchase additional services, the technician writes them onto the work order, Nationwide bills TWC, and the technician is paid his or her forty-five percent "cut" of the contract rate for the service.

During his tenure at Nationwide, Mr. Owopetu completed sixty-seven jobs for which TWC paid Nationwide $1,634.06, and for which Nationwide paid Mr. Owopetu $740.28.  The Complaint in this case was filed on January 22, 2010 by James Carrington, another former technician at Nationwide's Raleigh facility, alleging that Nationwide violated the FLSA by employing employees for workweeks longer than forty hours without compensating such employees at the required overtime rate.  Mr. Owopetu and Dameion Moore subsequently joined as plaintiffs.  Mr. Owopetu is now the only remaining plaintiff after plaintiffs Carrington and Moore stipulated to the dismissal of their case with prejudice on May 4, 2010.

## II.     Disputed Facts.

Mr. Owopetu, as the nonmoving party, essentially raises two factual disputes. First, while he agrees with Nationwide that service technicians are able to occasionally increase their pay by persuading TWC customers to order additional services, he avers that this is "at best a tiny part of installer[s'] income." (Doc. 32-7 at 5.)  Second, Mr. Owopetu disputes the number of hours that he worked.  Although he does not provide his total hour count for each week of his employment, he submits records which he personally created and maintained that show that he worked 52.5 hours during the week ending November 7, 2009 (as opposed to the 40.75 hours claimed by Nationwide), and 40.5 hours during the week ending November 14, 2009 (.5 hours fewer than the 41 hours credited to him by Nationwide).

## III.    Analysis and Conclusions of Law.

### A.     Standard of Review.

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In deciding the motion, the trial court must resolve all

3

ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

To avoid summary judgment the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

### B.     The "Retail or Service Exemption" to the FLSA.

The overtime compensation requirement of the FLSA, 29 U.S.C. § 207(a)(1), provides that "employees who work more than 40 hours per week must be compensated for each hour worked over 40 'at a rate not less than one and one-half times the regular rate at which he is employed.'" *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009) (quoting 29 U.S.C. § 207(a)(1)). The Act also sets forth a number of exemptions to this requirement. *See* 29 U.S.C. § 207(b)-(q). Here, Nationwide contends that it is exempt from paying Mr. Owopetu overtime compensation under the "retail or service exemption" enumerated in section 207(i), which provides that:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of [40 hours], if, (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). "Because the FLSA is a remedial law, exemptions to the overtime pay requirement are 'narrowly construed against the employers seeking to assert them

4

and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 150 (2d Cir. 2010) (quoting *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (other internal quotation marks omitted)).  The burden of proving that an employee is exempt from the overtime requirement is on the employer. *Id.* at 150.

Here, in order to qualify for the retail or service exemption, Nationwide must demonstrate that (1) more than half of Mr. Owopetu's compensation for a representative period of not less than one month represented commissions on goods or services; (2) Mr. Owopetu was employed by a retail or service establishment; (3) and Mr. Owopetu's regular rate of pay exceeded one and one-half times the federal minimum hourly wage. *See Schwind v. EW & Assocs., Inc.*, 371 F. Supp. 2d 560, 563 (S.D.N.Y. 2005).  The court addresses each element in turn.

### i.  More Than 50% of Mr. Owopetu's Compensation Represents Commission.

Nationwide contends that the percentage of every work order that it pays to its technicians constitutes a "commission," and that such payments exceed fifty percent of the technicians' total compensation.  Mr. Owopetu does not dispute that the "cut" of each work order that he received amounted to more than fifty percent of his compensation. Rather, he argues that such payments do not constitute a "commission" under the FLSA.

Neither the FLSA nor U.S. Department of Labor (DOL) interpretive regulations provide a definition for the term "commission" as it is used in the retail or service exemption. *See Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3d Cir. 2010).  Indeed, the meaning of "commission" under the FLSA "is an issue that finds little illumination from the sparse case law and the vague references in statutes and regulations." *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001).  In *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007), Judge Posner offered the following summary of what a commission entails and why those who receive it are exempt from the FLSA's overtime requirements:

> The essence of a commission is that it bases compensation on sales, for
> example a percentage of the sales price, as when a real estate broker
> receives as his compensation a percentage of the price at which the property
> he brokers is sold.  Although his income is likely to be influenced by the
> number of hours a week that he works, the relation is unlikely to be a
> regular one.  In one week business may be slow; he may make no sales and
> thus have no income for that week.  The next week business may pick up
> and by working overtime that week he may be able to make up the income
> he lost because of slack business the previous week.  Over a year his hours
> of work may be similar to those of regular hourly employees.  So if he had
> to be paid overtime, his annual income would be higher than theirs even
> though he hadn't worked more hours over the course of the year than they
> had.  We take this to be the rationale for the commission exemption from
> the FLSA's overtime provision.

*Yi*, 480 F.3d at 508.  In practice, courts have generally concluded that there are three

components to a commission-based compensation scheme: (1) the employee's

compensation must be tied to customer demand or the quantity of sales, *see Yi*, 480 F.3d

at 510; (2) the compensation plan must provide performance-based incentives for the

employee to increase his or her income, *see Parker*, 620 F.3d at 284; and (3) there must

be proportionality between the value of the goods or services sold, and the rate paid to the

employee, *see Wilks v. Pep Boys*, 2006 WL 2821700, at *11 (M.D. Tenn. Sept. 26, 2006),

*aff'd by* 2008 WL 2080551 (6th Cir. May 15, 2008); *see also* Jeffrey D. Pollack,

*Overtime: Retail or Service Establishment Exemption*, 244 N.Y.L.J. 4, 5 (July 13, 2010)

(explaining both the incentive and proportionality requirements developed by the case

law).  These three components ensure that commission-based compensation is

"decoupled from the actual time worked," a characteristic that multiple circuit courts of

appeals and the DOL have identified as a "hallmark" of how commissions work.  *Parker*,

620 F.3d at 284.

     Mr. Owopetu argues that Nationwide's compensation plan fails to satisfy the last

two of these components.  First, he contends that there is inadequate incentive because

the technicians are not salespeople.  While the technicians may increase their pay by

working faster and securing more of the work orders placed by TWC, they have very

little, if any, influence over the initial decision to place work orders made by TWC customers. Thus, absent an incentive to *increase sales*, Mr. Owopetu argues that a commission cannot exist. Second, he contends that proportionality is absent because the technicians receive only a percentage of the scheduled rate for each service based on the contract between Nationwide and TWC, and do not receive a percentage of the cost charged to the end-user customer. In response, Nationwide relies primarily on *Horn v. Digital Cable & Commc'ns, Inc.*, 2009 WL 4042407 (N.D. Ohio Feb. 11, 2009), a case in which the court found that a subcontractor cable installation company employing the same compensation scheme as Nationwide paid its service technicians a commission, and was therefore exempt from paying overtime compensation.

Mr. Owopetu's first argument conflates the requirement that a commission be based on sales, with the notion that only salespeople are paid commissions. Neither case law nor DOL regulations establish a *per se* requirement that commission employees must be "in sales." Although the "sales commission" may be the most common type of commission, "persons not engaged in the sale of goods—receivers, trustees, bailees, and others—are sometimes compensated in the form of what are commonly called commissions . . . within the meaning of 29 U.S.C. § 207(i)[.]" *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir. 1987); *see also* 29 C.F.R. § 779.413(b) ("the requirement of the exemption is that more than half the employee's compensation represents commissions 'on goods or services,' which would include all types of commissions customarily based on the goods or services which the establishment sells, and not exclusively those measured by 'sales' of these goods or services."). Further, a number of cases have found commissions to exist based upon an employee's incentive merely to work faster. *See, e.g., Klinedinst*, 260 F.3d at 1256 (finding that body shop painters were paid a commission, in part, because the compensation scheme "provides workers with an incentive to work quickly"); *Yi*, 480 F.3d at 509 (finding that automobile repair technicians were paid a commission because the "faster the team works, the more

7

it earns per number of hours . . . . That is how commissions work; they are decoupled from actual time worked.").[1]

Here, it is undisputed that Nationwide's method of compensating its service technicians provides them with an incentive to work faster and more efficiently. The faster a technician completes one work order, the sooner he or she can complete the next one and earn forty-five percent of the rate at which TWC compensates Nationwide for its completion. Thus, the technicians' pay is "decoupled from actual time worked," because they can increase their pay per hour by working faster and completing more work orders.

Next, the proportionality component is satisfied because Nationwide technicians receive a percentage of the contract price paid by TWC for every work order. "Commissions, for purposes of Sec[tion] 7(i), usually denotes a percentage of the amount of monies paid out or received," as opposed to paying a set flat-rate for every item, regardless of its value. Dep't of Labor Op. Ltr., 2005 WL 3308624 (Nov. 14, 2005); *see also Wilks*, 2006 WL 2821700, at *18 (finding that plaintiffs did not earn commissions because they "merely earn a predetermined amount for each task they complete and . . . this amount does not fluctuate in tandem with the amount charged to the customers."); Dep't of Labor Op. Ltr., 1996 WL 1031770 (Apr. 3, 1996) (opining that if alarm system installers "were to be compensated on a percentage of the sales price of the alarm systems they installed," as opposed to receiving "a flat fee per installation," such a "method of payment would constitute payment on a commission basis for purposes of section 7(i) of the FLSA.").

It is undisputed here that Nationwide's service technicians are paid a percentage of the scheduled rate for every service they perform, and their pay thus fluctuates "in

---

[1] *Horn, supra*, is not helpful to Nationwide on this point. There the court emphasized that the service technicians had the opportunity to increase their pay by influencing the cable company's customers to purchase additional services. The court also noted that, "significantly, original work orders are modified in over 50% of the jobs." *Horn*, 2009 WL 4042407, at *6. While Nationwide asserts that its service technicians had similar opportunities, Mr. Owopetu disputes that they arose often, and, in any case, Nationwide does not allege that more than 50% of its technicians' compensation was earned in this manner, as would be required to fall under the overtime exemption.

8

tandem" with the value of each service. *See* Docs. 10-1 ¶ 7, 32-7 ¶ 7. As the court in *Horn* explained under identical circumstances, proportionality exists based on the undisputed facts in this case because Mr. Owopetu's "compensation is based on a direct percentage compensation system of what [Nationwide] earns for the services Plaintiff[] provide[s], and Plaintiff['s] commission rates vary and are proportional to the amount [Nationwide] charge[s] [TWC] for that particular service." *Horn*, 2009 WL 4042407, at *4. Contrary to Mr. Owopetu's assertion, this proportionality is not disturbed by the fact that Nationwide is compensated by a third party, TWC, rather than the individual end-user customers. Regardless of the source of the payment, Nationwide splits a percentage of the revenue with its service technicians. *See id.* at *6 ("Defendants correctly maintain that the fact that Cox [Cable], a third party, pays Digital Cable for the customer services provided by [the plaintiff cable technicians] [is] irrelevant to the issue of whether Plaintiffs were paid [a commission].").

Finally, although Mr. Owopetu was not a salesman, his compensation was tied to customer demand and the quantity of Nationwide's sales. Besides training other technicians, he had no opportunity for income unless work orders were generated by TWC customers. *See Yi*, 480 F.3d at 510 (finding that auto repair technicians' compensation was based on sales because it depended on "the flow of wounded cars into each of [the defendant-employer's] local repair shops," even though the technicians had no responsibilities for generating sales).

In sum, because Mr. Owopetu's ability to earn income fluctuated based upon the volume of customer work orders, he was paid a percentage of the value of each service performed, and he was provided performance-based incentives to increase his income, he falls squarely within the policy rationale for the commission exemption from the FLSA's overtime provision. *See Yi*, 480 F.3d at 508; *Horn*, 2009 WL 4042407, at *5. Accordingly, considering the facts in the light most favorable to Mr. Owopetu, more than fifty percent of his total compensation at Nationwide represented commissions on goods or services.

9

ii.     **Nationwide has not Established That it is a "Retail or Service Establishment."**

A retail or service establishment is "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." *English v. Ecolab, Inc.*, 2008 WL 878456, at *2 (S.D.N.Y. March 31, 2008) (quoting 29 U.S.C. § 213(a)(2) (repealed by Pub. L. No. 101-157 (1989)).[2]  To satisfy this element, then, Nationwide must show both that its cable/broadband installation and repair services are not "sales for resale," and that they are recognized as retail services in the industry. *See* 29 C.F.R. § 779.322 ("Under the Act," the requirement that the employer provide "retail" sales or services "is distinct from the requirement that 75 percent of annual dollar volume be from sales of goods or services 'not for resale'").[3]  As discussed below, Nationwide has established that it provides services that are not for resale; however, it cannot be determined on summary judgment that Nationwide is a retail or service establishment because it has not provided sufficient evidence to show that its services are recognized as retail in the industry.

a.     **Nationwide's Services are not Sold for Resale.**

Nationwide argues that its cable/broadband installation and repair services are not for resale because they are provided directly to "end-user" customers in their homes, and not to distributors who acquire the services with the intent of reselling them.  In other words, the services are delivered to consumers who are expected to use, but not in any

---

[2] Section 7(i) does not define the term "retail or service establishment."  Instead, the court must look to the definition contained in the now-repealed section 13(a)(2) of the FLSA, which set forth the former "retail or service establishment" exemption. *See Kelly v. A1 Tech.*, 2010 WL 1541585, at *10-11 (S.D.N.Y. Apr. 12, 2010) ("courts have uniformly concluded that, despite the 1989 repeal of the exemption [of] section 13(a)(2) . . . , the definition of a retail or service establishment that was contained in that section still applies to the phrase as used in section 7(i)"); 29 C.F.R. § 779.411 (explaining that, for purposes of the section 7(i) exemption, a "retail or service establishment" is as defined in section 13(a)(2) of the FLSA).

[3] Mr. Owopetu offers no argument disputing that Nationwide is an "establishment," or that, assuming the cable installation services are retail, they fail to comprise 75% of Nationwide's annual dollar volume.

way resell, the products and services that Nationwide has provided to them. Mr. Owopetu argues that because it is TWC rather than the end-user customer who compensates Nationwide for these services, TWC is effectively "reselling" the services to its customers. Mr. Owopetu acknowledges that TWC customers may incur no additional charges for Nationwide's services, but contends that TWC nonetheless "resells" the services because their cost is a factor in setting the rates it charges for cable and broadband internet.

The FLSA does not define the term "resale," but DOL regulations and other courts apply the term's "common meaning," which "is the act of 'selling again.'" 29 C.F.R. § 779.331; *see also Schwind*, 371 F. Supp. 2d at 566; *English*, 2008 WL 878456, at *11 n.15. "A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, or as a part, component or ingredient of another article." 29 C.F.R. § 779.331.

Applying this standard under analogous facts, other courts have found that a resale of goods or services did not occur, and that the employers in question were "retail or service establishments" under the FLSA. For example, in *Schwind, supra*, the defendant-employer provided its own independent contractors to provide computer training for its clients' customers. The end-user customers—those actually receiving the computer training—then compensated the defendant's clients, and who in turn compensated the defendant. *Schwind*, 371 F. Supp. 2d at 566. Thus, as here, the defendant-employer provided services directly to customers of third party clients, but was not compensated by the end-user customers themselves. In assessing whether the retail or service exemption applied, the court found that the computer training services were *not* being resold, because the "defendants provided a service to the end customer, even if it was their client's customer." *Id.*

The facts in *Schultz v. Crotty Bros. Dallas, Inc.*, 304 F. Supp. 191 (W.D. Tex. 1969) are even more analogous. There, the defendant-employer was a food service

11

company who operated pursuant to a contract with a boarding school. The contract required the defendant to serve meals to students and faculty according to a regular schedule, and the school compensated the defendant at a rate of $750 per month. The students to whom the food was provided did not pay the defendant directly; rather, they paid the school for tuition, room, and board, the cost of which included food service provided in the school's dining facilities. *Id.* at 192-93. The court rejected the argument that there was a resale of goods because the school "buys the food from the defendant and then resells it to the students or their parents" as part of tuition. *Id.* at 196. The court reasoned that the arrangement did not involve "reselling" because the school "never acquire[d] any right, title or interest in the food." Although "money passe[d] from the students' parents through the school to the defendant," the court viewed this as merely a "matter of convenience" that could "not be used as a basis for holding a resale has occurred." *Id.*; *see also Wirtz v. Campus Chefs, Inc.*, 303 F. Supp. 1112 (N.D. Ga. 1968) (finding that defendant-employer operating dining halls at various colleges was a "retail establishment" within FLSA exemption, even though students paid the college at registration rather than paying the defendant directly).

The same result is warranted here. Nationwide's provision of cable installation and repair services to TWC customers does not constitute "sales for resale" because there is no subsequent sale, that is, no "selling again," after the services are provided. Instead, the customers to whom Nationwide directly provides its services are "at the very end of the stream of distribution," and therefore Nationwide "provides . . . its repair services . . . for the comfort and convenience of [the general] public in the course of its daily living," as opposed to providing them for redistribution. 29 C.F.R. § 779.318(a). [4]

---

[4] The cases on which Mr. Owopetu relies are distinguishable. In *Goldberg v. Warren G. Kleban Eng'g Corp.*, 303 F.2d 855 (5th Cir. 1962), and *Mitchell v. Sherry Corine Corp.*, 264 F.2d 831 (4th Cir. 1959), the courts denied "retail establishment" status to employers who operated under subcontracts, and who had no end-user customers of their own. In *Goldberg*, the defendant-employer installed plumbing, heating, and air-conditioning equipment in commercial construction projects completed by general contractors. *Goldberg*, 303 F.2d at 856. The defendant-employer in *Mitchell* sold meals to an airline at an agreed upon price, and the airline

**b.     Nationwide has not Established That its Services are
Considered "Retail" in the Industry.**

Having concluded that Nationwide's services are not "for resale," Nationwide
must next prove that its services are recognized as "retail" in the industry.  Although the
statute's language suggests that the term "retail" is to be defined solely by reference to
industry standards, the Supreme Court has held that the term's meaning is a question of
law to be determined by the courts, and not by the defendant or the defendant's industry.
*See Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 204-05 (1966); *English*, 2008
WL 878456, at *12 n.17 ("Though the Court must assess whether [the defendant's] sales
are recognized as retail 'in' the [particular] industry, '[i]t is clear from the legislative
history and judicial pronouncements that it was not the intent of this provision to delegate
to employers . . . the power to exempt themselves from the requirements of the
[FLSA].'") (quoting 29 C.F.R. § 779.324).  Following DOL regulations, courts have
recognized that this inquiry involves a two-part test: first, the employer must be part of an
industry in which there is a "retail concept," and, second, the specific sales or services at
issue must be considered retail within that industry.  *See Kelly*, 2010 WL 1541585, at *11
(citing 29 C.F.R. §§ 779.316, 779.322).

Mr. Owopetu apparently does not dispute that the industry of servicing, installing,
and repairing cable and broadband equipment has a "retail concept."  He notes that he
previously worked for other cable installation companies performing similar work that he
characterizes as retail.  *See* Doc. 32-7 ¶ 9.  Instead, he contends that Nationwide's

---

then distributed the meals to its passengers. *Mitchell*, 264 F.2d at 832-33.  In each case, the court
found that "resales" occurred, in part, because the ultimate consumers of the employer's business
neither paid nor contracted with the employer directly. *See, e.g., Goldberg*, 303 F.2d at 858-59.
These cases are distinguishable because in each "the defendants transferred both possession and
ownership of the products to a third party who in turn sold and transferred the products to the
ultimate buyer." *Crotty*, 304 F. Supp. at 196.  In other words, rather than directly servicing the
end-user customer as Nationwide does when it performs work orders in the homes of TWC
subscribers, the employers in *Goldberg* and *Crotty* delivered goods to third parties who in turn
transferred the goods to their customers.  In this way, there was a "selling again" of the goods
and services in *Goldberg* and *Mitchell* that is not present here.

business model cannot be considered retail because, as a subcontractor, it has effectively traded the ability to serve a wider customer base and charge higher prices for the stability of being tied to the demand of TWC's existing customers. Under this arrangement, Mr. Owopetu argues that Nationwide does not sell its services to the general public or serve the everyday needs of the community because TWC is its only paying customer. In response, Nationwide argues that its services are considered retail because they are delivered at the end of the chain of distribution, and that Nationwide cannot be distinguished from other cable/broadband installation establishments solely because it operates under a subcontract and services only the customers of a third party.

To determine whether the particular industry recognizes that an employer provides "retail" services, the court "first looks to evidence as to how persons in the industry and with knowledge of the industry view the establishment." *La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035, 1041 (C.D. Cal. 2010) (citing *Acme Car & Truck Rentals, Inc. v. Hooper*, 331 F.2d 442, 446 (5th Cir. 1964)).

> Such a determination must take into consideration the well-settled habits of business, traditional understanding and common knowledge. These involve the understanding and knowledge of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations. The understanding of all these and others who have knowledge of recognized classifications in an industry, would all be relevant in the determination of the question.

29 C.F.R. § 779.324. Next, the inquiry shifts to a consideration of "whether the business (1) sells goods to the general public; (2) serves the everyday needs of the community; and (3) is at the end of the stream of distribution and does not take part in the manufacturing process." *La Parne*, 714 F. Supp. 2d at 1043; *see also* 29 C.F.R. § 779.318(a) ("Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located.").

Nationwide has failed to meet its burden under this standard because it has not offered any evidence "as to how persons in the industry and with knowledge of the

industry view" Nationwide's business.  Nationwide asserts in its Statement of Undisputed Material Facts (Doc. 10-1) that its "services are recognized in the industry as retail sales and services," but this assertion is not supported by any admissible evidence in the record as required by Rule 56.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]").  And without such evidence, Nationwide cannot establish that it is a retail or service establishment within the meaning of the FLSA.  Nationwide's argument to the contrary—that it is enough merely to show that its services are provided at the end of the distribution chain—would effectively reduce the inquiry to only whether the employer's sales are intended for resale, a proposition specifically rejected by DOL regulations. [5]  *See* 29 C.F.R. § 779.322.  Accordingly, Nationwide has not established that it is a retail or service establishment.  Because this is an essential element of the FLSA's retail establishment overtime exemption, it has failed to show that it is entitled to judgment as a matter of law.  For this reason, Nationwide's motion for summary judgment is DENIED.

### iii.    Mr. Owopetu's Regular Rate of Pay did not Exceed One and One-Half Times the Minimum Wage Throughout his Employment With Nationwide.

Nationwide's motion must also be denied as to certain weeks of Mr. Owopetu's employment because his regular rate of pay did not exceed one and one-half times the federal minimum wage.  29 U.S.C. § 207(i).  The regular rate of pay is "'the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed' and 'by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of nonovertime payments.'"

---

[5] It is likewise insufficient for Nationwide to assert that the court in *Horn* found that the defendant was a retail or service establishment under factually similar circumstances.  There, the plaintiffs did not dispute that the defendant provided "retail" services, and the court thus "confine[d] its analysis to . . . whether more than half of the employee's compensation . . . represents commissions on goods or services."  *Horn v. Digital Cable & Commc'ns, Inc.*, 2008 WL 7140826, at * 7 (N.D. Ohio Nov. 18, 2008).  Thus, the question of whether the defendant's services were recognized as retail within the industry was simply not at issue in *Horn*.

29 C.F.R. § 779.419 (quoting *Walling v. Youngerman-Reynolds Hardwood, Co.*, 325 U.S. 419, 424 (1945)). "The regular rate of pay 'is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate.'" *Schwind*, 371 F. Supp. 2d at 568 (quoting 29 C.F.R. § 779.419). DOL regulations further provide that "a single workweek" is the standard and that the averaging of hours over the course of two or more weeks is not permitted. *See* 29 C.F.R. § 778.104; *see also Viciedo v. New Horizons Computer Learning Center of Columbus, Ltd.*, 246 F. Supp. 2d 886, 895 (S.D. Ohio 2003) (following "the DOL's specific finding that the regular rate of pay is to be calculated on the basis of hours worked and compensation earned in a particular workweek.").

The regular rate of pay must be calculated weekly because, absent an exemption, the FLSA requires employers to pay overtime compensation to employees who work more than forty hours in any given week. "Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40." 29 C.F.R. § 778.104. This rule applies with equal force to "employees paid on a commission basis." *Id.*

Throughout the time that Mr. Owopetu worked for Nationwide, the federal minimum wage was $7.25. *See* 29 U.S.C. § 206. Therefore, to qualify for the exemption, Mr. Owopetu's "regular rate of pay must have exceeded [one and one half times $7.25, or $10.88,] per hour for each workweek in which he asserts that he was entitled to overtime wages." *Schwind*, 371 F. Supp. 2d at 568 n.5.

Before applying this standard to Mr. Owopetu's case, the court first rejects Nationwide's argument that a single rate of pay should be calculated based on Mr. Owopetu's aggregate hours worked and aggregate compensation earned. Under this method, Nationwide asserts that Mr. Owopetu's regular rate of pay was $14.10 per hour, because he earned a total of $15,631.55 over the course of 1,108 hours. Nationwide

16

relies on *Schwind*, in which the court averaged the plaintiff's commissions throughout a year, and then allocated the average to each week. *Schwind*, 371 F. Supp. 2d at 568. The court justified this deviation from the normal week-by-week calculation under 29 C.F.R. § 778.120, which permits courts to create their own "reasonable and equitable method" of calculating the regular rate of pay when "it is not possible or practicable to allocate the commission among the workweeks of the period in proportion to the amount of commission actually or reasonably presumed to be earned each week[.]" In *Schwind*, the court faced the "unique circumstances" of a plaintiff who received "deferred commission" only after the customer paid the defendant-employer, and a record devoid of evidence identifying the number of hours that the plaintiff had worked. *Schwind*, 371 F. Supp. 2d at 567-68.

Nationwide argues that the present case is similar to *Schwind* because Mr. Owopetu's "work schedule fluctuated greatly." (Doc. 16 at 2.) But unlike *Schwind*, there is no evidence that Mr. Owopetu was *paid* on a fluctuating or irregular schedule. Indeed, Nationwide has not only submitted all of Mr. Owopetu's hours and compensation broken down on a weekly basis, it has also calculated Mr. Owopetu's hourly rate for each week of his employment. *See* Doc. 16-4. Given this information, calculating the regular rate of pay on a weekly basis is neither impossible nor impracticable, and Nationwide's reliance on *Schwind* is misplaced. *See Selz v. Investools, Inc.*, 2011 WL 285801, at *10 (D. Utah Jan. 27, 2011) (distinguishing *Schwind* "because in *Schwind* it was not possible to establish an hourly rate of pay for any given week due to the delay in commissions being paid out. No such complication is present here.").

Based on the payroll records submitted by Nationwide, Mr. Owopetu's regular rate of pay exceeded $10.88 during thirteen weeks in which he worked more than forty hours. However, in the weeks ending September 26, 2009, October 10, 2009, and October 24, 2009, Mr. Owopetu worked more than forty hours but made less than $10.88 per hour. *See* Doc. 16-4. Accordingly, even assuming that it is a retail or service establishment, Nationwide would not be exempt from paying Mr. Owopetu overtime

compensation for the three weeks in which Mr. Owopetu worked overtime hours but earned a regular rate of less than $10.88.[6]

## IV.    Conclusion.

Construing the facts in the light most favorable to Mr. Owopetu, Nationwide has established that more than 50% of Mr. Owopetu's compensation came in the form of commissions on goods or services, and that, for thirteen of the sixteen weeks in which Mr. Owopetu worked more than forty hours, his regular rate of pay exceeded one and one half times the federal minimum wage. However, Nationwide has neither provided sufficient evidence to conclude that it is a retail or service establishment, nor shown that it paid Mr. Owopetu more than $10.88 per hour for all weeks in which he worked more than forty hours. For these reasons, Nationwide's motion for summary judgment (Doc. 10) is DENIED WITHOUT PREJUDICE.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _11_th day of March, 2011.

Christina Reiss, Chief Judge
United States District Court

---

[6] Mr. Owopetu's assertion that Nationwide failed to accurately count his hours does not create a material issue of disputed fact. Relying on Mr. Owopetu's records, which cover only the weeks ending November 7 and November 14, 2009, his regular rate of pay for the week ending November 7 was $12.90, which is greater than one and one half times the minimum wage. For the week of November 14, Mr. Owopetu's evidence actually shows fewer hours worked (40.5) than Nationwide has given him credit for (41).